**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JAMES TODD KELLEY, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 03-4817 (WHW) |
| | : | |
| EDISON TOWNSHIP, MIDDLESEX | : | |
| COUNTY PROSECUTOR'S OFFICE, DET. | : | |
| FRED LACIK, II, LT. MICHAEL PALKO, | : | |
| DET. JEFF ABRAMS, SGT. CHRIS | : | |
| ENGRAM, PTLM. JEFF DIAKUNCZAK, | : | |
| PTLM. BRIAN MIECKOWSKI, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| DET. JEFF ABRAMS, et al. | : | |
| | : | |
| Third Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF NEW JERSEY, | : | |
| | : | |
| Third Party Defendant. | : | |
| | : | |
| | : | |

**Walls, District Judge**

This Opinion addresses five motions as they deal with related issues. First, defendants Middlesex County Prosecutor's Office ("MCPO") and Chris Engram move for summary judgment. Second, defendants Fred Lacik and Michael Palko move for summary judgment. Third, Edison Township moves for summary judgment on all claims except the vicarious liability

NOT FOR PUBLICATION

claims arising out of defendant Jeff Abrams's conduct[1].  Fourth, defendants Jeff Diakunczak and

Brian Mieckowski move for summary judgment.  Fifth, defendant Abrams moves for summary

judgment relying on the brief and exhibits submitted by Palko and Lacik.  The motions are

decided without oral argument pursuant to Fed. R. Civ. P. 78.

### FACTS AND PROCEDURAL BACKGROUND

On October 9, 2003, plaintiff James Todd Kelley filed a Complaint, later amended on

July 1, 2004, alleging both federal and state law claims against Edison Township, MCPO, Det.

Fred Lacik, II, Lt. Michael Palko, Det. Jeff Abrams, Sgt. Chris Engram, Ptlm. Jeff Diakunczak,

and Ptlm. Brian Mieckowski.  His claims arise from the following undisputed facts:  The MCPO

has an investigative arms that includes a Narcotics Task Force.  The task force is populated by

investigators, detectives and agents who possess the same police powers as municipal police

officers but with county-wide jurisdiction.  The members of the task force are solicited from

municipal and other law enforcement agencies.  Participating agencies loan one or more police

officers to the task force for up to one year.  In return, the MCPO reimburses the agencies for part

of that officer's salary.  The task force is organized into three squads, each with six agents and

one sergeant.  At any given time, between five and ten members of the task force are employees

on loan from other agencies.  While the loaning agency selects which officers to send, the task

force commander retains the right to return any loaned officer and the right to refuse the renewed

assignment of any particular officer.

---

[1] Edison's vicarious liability claims regarding Abrams are addressed in a separate
opinion.

NOT FOR PUBLICATION

Engram is a sergeant with the MCPO and was assigned to the task force during October 2002.  At that time, Lacik, Palko, Diakunczak and Mieckowski were Edison Township police officers.  Mieckowski was a trainee at the time.  Abrams was also an Edison Township police officer, but he was assigned to the MCPO Narcotics Task Force.  Engram was Abrams's supervisor on the task force.

On the morning of October 30, 2002, Abrams received information from a confidential informant that a James Hemenway would sell five ounces of cocaine that evening.  As the case agent for the investigation, Abrams was responsible for coordinating the investigation, getting any warrants, and preparing any written reports.  As the task force does not have any marked patrol cars or jail, it is standard protocol for the task force to contact local law enforcement for back up and support when operating in a particular municipality.  Abrams and Engram contacted the Bay Shore Narcotics Task Force ("BSNTF") because Hemenway was located in Monmouth County.

Abrams and Engram met with the confidential informant near the Ramada Inn in Edison that afternoon and confirmed that the sale would take place at the Ramada Inn.  An officer from BSNTF was present for that meeting, but was not included in the conversation.  The informant described Hemenway as a white male, age 25 to 30, medium to heavy-set build, six-feet tall with blondish-brown hair.  The informant also told Abrams and Engram that the deal would happen between 8:30 p.m. and 10:30 p.m. and that Hemenway would be driving a white minivan.  He also told them that Hemenway might be armed with a handgun.  While Engram did not have a

**NOT FOR PUBLICATION**

photo of Hemenway, the suspect was known to the Edison police because of his earlier arrest for

narcotics possession.

Because the sale was to take place in Edison, either Abrams or Engram contacted the

Edison Police Department for back up and support.  Palko was contacted and he in turn contacted

Lacik to tell him to come in for the job.  Abrams and Engram then formulated a tactical plan to

arrest Hemenway.  Abrams met with the officers from Edison Township and the task force in the

parking lot of the Sheraton Hotel down the road from the Ramada Inn to brief them on the plan.

Abrams described the arrest location, the target, and his vehicle, and he said that there was a

possibility that the suspect was armed.  There is a dispute as to whether Abrams showed officers

a picture of the target and whether Abrams told the officers that the vehicle had Florida license

plates.  With respect to who was overseeing the surveillance, there appears to be a conflict as to

whether Palko and Engram were supervising the operation together, whether Engram was solely

in charge of supervision, or whether Abrams was in charge of the operation.  There is no dispute,

however, that Engram and Palko were the highest ranking officers on the scene.

While it is disputed how many uniformed officers were present for the surveillance

operation, it is undenied that some of the officers were in plain clothes, including Abrams and

Lacik.  Plaintiff disputes whether the plain-clothed officers were wearing anything indicating that

they were police officers.  It is not disputed that Diakunczak and Mieckowski were in uniform

and drove a marked patrol car.

The officers were split up in several unmarked police cars which were located in different

areas of the Ramada Inn parking lot.  There are two driveway entrances to the Ramada Inn.  The

**NOT FOR PUBLICATION**

officers were instructed to arrest Hemenway on sight.  Engram was in an unmarked gray Dodge

Intrepid that was equipped with flashing lights on the front grill and an audible siren.  Engram's

passengers were the BSNTF officer and the informant.  Abrams was in an unmarked Ford

Explorer with Lacik and it appears to be disputed whether this vehicle was equipped with

emergency lights.  Palko and another officer, Det. Todd, were in an unmarked Ford Expedition,

equipped with both sirens and lights.  Palko's vehicle was positioned near the back of the parking

lot.  The other officers in the parking lot, Det. Hahn and Det. Huth, who are not named in this

suit, were also in an unmarked vehicle positioned in the Ramada Inn parking lot.  Diakunczak

and Mieckowski were positioned approximately a quarter of a mile from the Ramada Inn and

were waiting in the parking lot of an office building.

      At approximately 9:00 p.m., plaintiff Kelley drove up to the Ramada Inn in a white

minivan with Florida license plates.  It was raining at the time.  Abrams advised Engram that the

suspect's vehicle had entered the parking lot.  Abrams and Lacik drove slowly towards plaintiff's

vehicle with their lights off and were staring at him intently.  Plaintiff turned the car and drove

out of the parking lot, turning onto King George Post Road.  Plaintiff then returned to the

Ramada Inn parking lot using the second entrance to the parking lot from that road.  Plaintiff

drove towards the front of the hotel and a dark sport utility vehicle cut him off and then stopped

near him.  One of the officers, though it is disputed which one, got out of the dark vehicle and

walked towards plaintiff.  The officer was yelling at plaintiff.  Plaintiff did not hear what the man

was saying, nor did he see any sign that the man was a police officer.  The other officer who was

in the vehicle observed plaintiff and concluded that he fit the description of the suspect. Plaintiff,

NOT FOR PUBLICATION

thinking he was being carjacked, sped out of the parking lot, hopping the curb and turned right

onto King George Post Road.  The officer then returned to his vehicle and Abrams and Lacik

followed plaintiff out of the parking lot.  Engram also followed plaintiff in his car and was the

first car in pursuit.  It is disputed whether Engram engaged the lights and siren on his car when he

exited the parking lot.  The informant did not tell Engram that plaintiff was not the target.

When plaintiff exited the Ramada Inn parking lot the first time before turning back in at

the second entrance of the hotel, Edison Police Det. Hahn contacted Diakunczak and

Mieckowski and requested their assistance at the Ramada Inn.  As Diakunczak and Mieckowski

were driving towards the Ramada Inn, they observed plaintiff's vehicle leaving the parking lot

followed by three unmarked police cars.  Diakunczak and Mieckowski then activated the

emergency lights and siren on their patrol car.  Palko never observed plaintiff when he was in the

Ramada Inn parking lot and was not aware that any officers were in pursuit of plaintiff.

Plaintiff's car approached the intersection at Raritan Center Drive.  Even though the

traffic light was red, plaintiff made a left turn onto Raritan Center Drive.  Plaintiff then made a u-

turn.  Plaintiff was then being pursued by three unmarked police cars and one marked car, the

fourth car in the line.  Up to the point plaintiff made the u-turn, Engram's car was in the lead,

followed by Huth and Hahn's car and Lacik and Abrams were in the third position.  After

plaintiff made the u-turn, Lacik and Abrams were the lead car in pursuit.  Having turned around,

plaintiff approached the ramps to Route 514 and took the ramp for Route 514 west.  While on the

ramp, it is undisputed that plaintiff's rear bumper and the front bumper of the first unmarked

police car, Abrams and Lacik's car, came into contact, but it is disputed whether Lacik and

**NOT FOR PUBLICATION**

Abrams rammed plaintiff's car multiple times or if plaintiff caused the two cars to briefly collide

when he moved into Lacik's lane.  It is also undisputed that plaintiff was maneuvering his

vehicle so if Lacik and Abrams moved their car to the left, plaintiff moved to the left, if it moved

to the right, he moved to the right.  While on the ramp, Diakunczak and Mieckowski got

permission from their sergeant to take the lead position in the pursuit and then radioed the

officers involved in the pursuit to advise them of such.  Diakunczak and Mieckowski began

moving forward in the line of cars so that by the time they had reached the top of the ramp, the

marked police car was the first car leading the pursuit of plaintiff.

At about the time plaintiff exited the Ramada Inn parking lot, plaintiff dialed 9-1-1 on his

cell phone.  The call was recorded.  During the call, plaintiff told the operator that people were

chasing him and that he did not know what was going on.  The dispatcher contacted the Edison

Police dispatcher and told him that plaintiff was in a white van and was being chased in Edison

near the Raritan Center.  The Edison Police dispatcher confirmed that the Edison police were

chasing a person in a white van and advised the other dispatcher when the police eventually

stopped plaintiff's car.

The chase continued on Route 514 for about half a mile until the plaintiff's vehicle pulled

left onto the median and stopped.  It is disputed whether plaintiff intended to stop.  Plaintiff says

he pulled over as soon as he noticed the marked police car following him.  Plaintiff was still on

the phone with the dispatcher when he saw the emergency lights on the marked patrol car.

Diakunczak and Mieckowski stopped their patrol car on Route 514 in the left shoulder of the

road behind plaintiff's vehicle.  They exited their vehicle, drew their weapons, and ran towards

NOT FOR PUBLICATION

plaintiff's vehicle.  Diakunczak ran towards the driver's side and Mieckowski went towards the

passenger side of the vehicle.  Plaintiff says they were yelling for plaintiff to get out of the car

and defendants say that they were also yelling at him to show his hands.  The unmarked cars also

parked, and Abrams and Lacik approached plaintiff's car with their weapons drawn.  They also

yelled for plaintiff to show his hands but plaintiff did not respond to their directions.  Plaintiff

says that he did not react to their orders because he was not certain who they were screaming at.

Plaintiff also heard someone yell "gun" when he was inside his car.  It appears to be disputed

whether another officer also yelled that it was not a gun in plaintiff's hands but a phone.

Diakunczak approached plaintiff's vehicle, holstered his weapon, and opened plaintiff's

car door while repeating the instruction for plaintiff to get out of the car.  Plaintiff did not move

when Diakunczak opened the door so Diakunczak reached in to pull him out.  It is disputed how

Diakunczak removed plaintiff from the vehicle.  There is no dispute that Abrams pulled on

plaintiff's arm at some point during plaintiff's removal and arrest.  After being removed from the

vehicle, plaintiff went down onto the grass face first with his arms folded in front of his body.  It

is disputed whether plaintiff resisted being put to the ground upon being pulled from the vehicle.

By the time plaintiff was on the ground, Abrams and Mieckowski had run around the van to

where Diakunczak and plaintiff were. While plaintiff says that a number of the officers' feet were

thrust into his back when he was on the ground, he never saw which officers put their feet on his

back.

Engram was just getting out of his vehicle as plaintiff was being removed from his car.

Engram did not participate in removing plaintiff from his car.  While plaintiff was on the ground,

NOT FOR PUBLICATION

Diakunczak pulled his arms out from underneath him and handcuffed him.  While plaintiff was still on the ground, certain officers asked him where the drugs are.  Abrams asked plaintiff his name and repeatedly asked him if he had any drugs or weapons.  Then Diakunczak and Mieckowski each reached under one of plaintiff's arms and picked plaintiff up so that he was standing.  It is disputed whether it was at this point defendants realized that plaintiff was not their suspect as plaintiff claims defendants knew this earlier when there was communication between the dispatcher and defendants.  Diakunczak and Mieckowski ultimately placed plaintiff under arrest but they did not take part in the discussions regarding what crime with which plaintiff was to charged.  Abrams thought to have plaintiff charged with eluding.  After the police officers stood plaintiff up, plaintiff testified that Lacik lunged at him with his fists raised and had to be restrained by other officers.  It is unclear whether this is disputed by Lacik.

Diakunczak and Mieckowski walked plaintiff to their patrol car and put him in the backseat.  Either Abrams or Diakunczak came up to plaintiff while he was in the car and offered to take the handcuffs off and advised plaintiff that they think they have the wrong guy.  Engram, Abrams and Lacik returned to their respective cars and drove back to the Ramada Inn to resume their surveillance.  The target Hemenway eventually appeared and was arrested.  After the target was arrested, Lacik informed Palko of the chase and arrest of plaintiff.

Diakunczak was informed via radio that an arrest was made at the Ramada Inn and told that they should return there.  Plaintiff was in the car and accompanied Diakunczak and Mieckowski back to the Ramada Inn.  Plaintiff was then taken to the Edison Township police headquarters.  At no time while plaintiff was in custody did he request or need medical attention.

NOT FOR PUBLICATION

While plaintiff was in custody, he was questioned by Lacik, Diakunczak and Mieckowski.  While it is disputed exactly who made the decision to charge plaintiff with eluding, it is undisputed that Engram, Diakunczak and Mieckowski did not participate in the decision.  It is undisputed that Lacik signed a criminal complaint against plaintiff for eluding on October 30, 2002 and that Palko issued the summons.  It is also undisputed that Abrams and Palko became aware on October 30, 2002 that plaintiff had called 9-1-1 during the pursuit.  Plaintiff was released without bail and the charges against him were later dropped.

At plaintiff's deposition in this matter, plaintiff described Engram as a Caucasian man with light brown hair, a beard and a mustache.  It is undisputed, however, that Engram is an African-American.

Plaintiff complains that his rights were violated pursuant to 42 U.S.C. § 1983, alleging false arrest, false imprisonment, excessive use of force, and malicious prosecution.  His state law claims include intentional and negligent infliction of emotional distress, assault and battery, malicious prosecution, and false arrest and imprisonment.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the

NOT FOR PUBLICATION

suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

## DISCUSSION

I.  **Section 1983 Claims**

A.  MCPO and Edison Township

A local governing body may be held liable under 42 U.S.C. § 1983 only in limited circumstances.  See Monell v. Dep't of Social Serv., 436 U.S. 658, 688 (1978).  A local government "may not be held liable for constitutional violations solely upon the basis of *respondeat superior*, municipal liability only arises when a constitutional deprivation results from an official custom or policy."  Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998) (citing Monell, 436 U.S. at 691-94).  Plaintiffs must also prove that the municipal practice

NOT FOR PUBLICATION

was the proximate cause of the injuries suffered.  See Bielevicz v. Dubinon, 915 F.2d 845, 850

(3d Cir. 1990).

      Plaintiff argues that there are genuine issues of material fact regarding whether the

MCPO and Edison Township have any customs or policies that caused plaintiff's injuries.

Plaintiff contends that these defendants failed to produce any written policies in discovery and

summary judgment should not be entered in their favor just because plaintiff cannot identify any

policies that may have caused his injuries.  This argument has no merit.  Assuming that plaintiff

did request such documents from these defendants in discovery, plaintiff offers no evidence that

he has reason to believe such a document exists or that it would contain information relevant to

his claims.  Plaintiff also argues that, assuming the individual defendants were not aware of his

phone call to 9-1-1, Edison Township and the MCPO violated his rights by their practice of

failing to communicate with their employees.  In the Third Circuit, the law is clear that to

establish a custom or practice, a plaintiff must show that "policymakers were aware of similar

unlawful conduct in the past, but failed to take precautions against future violations, and that this

failure, at least in part, led to [her] injuries."  Beck v. City of Philadelphia, 89 F.3d 966, 972 (3d

Cir. 1996).  Plaintiff has presented no evidence of any similar unlawful conduct by Edison

Township employees or the MCPO employees in the past.  The law is clear that an isolated

incident of alleged misconduct does not amount to municipal liability.  See Groman v.

Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).  For these reasons, all the section 1983 claims must

be dismissed against the MCPO and Edison Township.

NOT FOR PUBLICATION

Having considered whether section 1983 claims can be maintained against the defendant

government entities, the Court now considers whether summary judgment on the section 1983

claims is appropriate for any of the individual defendants.

B.      False Arrest

It is well established that an arrest made without probable cause violates the Fourth

Amendment.  Hill v. Algor, 85 F. Supp. 2d 391, 397 (D.N.J. 2000).  The Third Circuit has

defined probable cause:

> Probable cause to arrest requires more than mere suspicion; however, it does not
> require that the officer have evidence sufficient to prove guilt beyond a reasonable
> doubt. Rather probable cause to arrest exists when the facts and circumstances
> within the arresting officer's knowledge are sufficient in themselves to warrant a
> reasonable person to believe that an offense has been or is being committed by the
> person to be arrested.

Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).  "A court must look at

the 'totality of the circumstances' and use a 'common sense' approach to the issue of probable

cause."  Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).  Plaintiff contends that there is

enough evidence in the record for a reasonable jury to find that when plaintiff was arrested,

defendants did not have a reasonable basis to conclude plaintiff committed a crime.  Plaintiff was

charged with eluding which is defined as: "Any person, while operating a motor vehicle on any

street or highway in this State . . . who knowingly flees or attempts to elude any police or law

enforcement officer after having received any signal from such officer to bring the vehicle or

vessel to a full stop commits a crime of the third degree."  N.J.S.A. § 2C:29-2(b).

1.      _Lacik, Abrams, Diakunczak and Mieckowski_

-13-

NOT FOR PUBLICATION

These four individual defendants argue that they are entitled to summary judgment on the false arrest claim because there was probable cause as a matter of law and they have qualified immunity.  All of these defendants engaged in the pursuit of plaintiff and were present when plaintiff was removed from his vehicle and arrested.

Defendants argue that there was probable cause as a matter of law to arrest plaintiff for eluding.  Plaintiff submits that there is a genuine issue of material fact as to whether defendants had probable cause because they had no reasonable basis to believe that plaintiff acted knowingly when he fled the Ramada Inn.  The Court agrees.  While summary judgment can be granted in certain cases on probable cause, "the existence of probable cause is a factual issue."  Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995).  There are genuine issues of material fact as to whether the officer who approached plaintiff at the Ramada Inn was wearing or holding any item that might indicate he was a police officer and whether the unmarked cars engaged their flashing lights and sirens when they pursued plaintiff.  There is also evidence that there was some communication between the police officers pursuing plaintiff and the dispatcher after plaintiff called 9-1-1.  There is also a dispute as to whether Abrams identified himself as a police officer when he approached plaintiff's vehicle in the Ramada Inn parking lot.  Because a reasonable jury could find that defendants did not have probable cause to arrest plaintiff for eluding, Lacik, Abrams, Diakunczak and Mieckowski's motions for summary judgment on the false arrest claim is denied on this ground.

Defendants also argue that they are entitled to qualified immunity for their actions. Whether defendants are entitled to qualified immunity depends first on "whether the plaintiff's

-14-

NOT FOR PUBLICATION

claims make out a violation of a constitutional right." Michaels v. New Jersey, 222 F.3d 118,

121 (3d Cir. 2000). If the Court concludes that plaintiff has alleged a violation of a constitutional

right, the next step is to determine whether defendants "violated a clearly established right such

that a reasonable official in the defendant's position would know that his conduct was unlawful."

Id. This second determination is known as the "objective reasonableness" test. The relevant

inquiry in making this determination is "whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir.

2004). "If it would not have been clear to a reasonable officer what the law required under the

facts alleged, then he is entitled to qualified immunity." Id. Whether defendants' actions were

objectively reasonable depends on material facts that are in dispute. For this reason, defendants

motions for summary judgment on the false arrest claim are denied on this ground as well. See

Mantz v. Chain, 239 F. Supp. 2d 486, 495 (D.N.J. 2002).

### *2.     Engram and Palko - Supervisory Liability*

"[A] defendant in a civil rights case cannot be held responsible for a constitutional

violation which he or she neither participated in nor approved." C.H. ex rel. Z.H. v. Oliva, 226

F.3d 198, 201 (3d Cir. 2000) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d

Cir.1997); Baker v. Monroe Tp., 50 F.3d 1186, 1190 (3d Cir. 1995)). To be personally liable

under section 1983, a plaintiff must show that the defendant participated in violating his or her

rights, or that the defendant directed others to violate them, or that the defendant, as the person in

charge of the raid, had knowledge of and acquiesced in his or her subordinates' violations.

Baker, 50 F.3d at 1190-91. Plaintiff argues that Engram and Palko are subject to supervisory

NOT FOR PUBLICATION

liability for his section 1983 claims.  "A supervisory official may be personally liable under §

1983 . . . where the official either 'directed others to violate [plaintiff's constitutional rights] or

had knowledge of and acquiesced in his subordinates' violations." Hill, 85 F. Supp. 2d at 407

(quoting Baker, 50 F.3d at 1190-91).  "Although this standard requires that the supervisory

official have actual knowledge of the misconduct, such knowledge 'can be inferred from

circumstances other than actual sight.'" Id.  Plaintiff claims that there is a genuine issue of

material fact as to whether Engram and Palko acquiesced in the pursuit, arrest and prosecution of

plaintiff.  Thus, the Court addresses only whether sufficient evidence exists for a reasonable jury

to find that Engram and Palko knew of and acquiesced in plaintiff's arrest.

       With respect to Engram, plaintiff has evidence that Engram was in one of the cars that

engaged in the pursuit of plaintiff.  There is also evidence that Engram was getting out of his car

when plaintiff was being removed from his vehicle.  Engram witnessed plaintiff being removed

from the vehicle, an event that Abrams took part in by grabbing plaintiff's arm.  Because it is

undisputed that Engram is Abrams's supervisor and that he witnessed plaintiff's removal from

the van, there is a genuine issue of material fact as to whether Engram acquiesced to the arrest of

plaintiff.  Engram also argues that he is entitled to qualified immunity on plaintiff's false arrest

claim because his conduct was objectively reasonable.  However, whether Engram's actions were

objectively reasonable depends on material facts that are in dispute.  For this reason, Engram's

motion for summary judgment on the false arrest claim is denied.

       As to Palko, plaintiff does not dispute that Palko never saw plaintiff at the Ramada Inn,

nor was he aware that any officers were in pursuit of plaintiff.  Palko first learned of the officers'

NOT FOR PUBLICATION

interaction with plaintiff after Hemenway was taken into custody.  Thus, Palko was not present

during the pursuit or arrest of plaintiff.  While actual knowledge of misconduct can be inferred

from circumstances other than actual sight, plaintiff does not point to any evidence that would

support a jury finding that Palko knew of plaintiff's pursuit and arrest and acquiesced to such

actions.  For this reason, Palko is entitled to summary judgment on plaintiff's false arrest claim.

       C.      Excessive Use of Force

Claims of excessive force by police officers in the context of an arrest should be analyzed

under the Fourth Amendment.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) (citing

Graham v. Connor, 490 U.S. 386, 395 (1989)).  To succeed on such a claim, a plaintiff must

show that a seizure occurred and that it was unreasonable.  Id.  With regard to the

unreasonableness element of the claim, the Third Circuit has offered the following guidance:

> An excessive force claim must be evaluated "from the perspective of a reasonable
> officer on the scene, rather than with the 20/20 vision of hindsight" and "must
> embody the allowance for the fact that police officers are often forced to make
> split-second judgments-in circumstances that are often tense, uncertain, and
> rapidly evolving-about the amount of force that is necessary in a particular
> situation."  The inquiry turns on "objective reasonableness," meaning that the
> standard is whether the police officer's "actions [were] 'objectively reasonable' in
> light of the facts and circumstances" facing the officer, regardless of the officer's
> intent or motivation. Factors to consider in making a determination of
> reasonableness include "the severity of the crime at issue, whether the suspect
> poses an immediate threat to the safety of the officers or others, and whether he
> actively is resisting arrest or attempting to evade arrest by flight." Additional
> factors include "the possibility that the persons subject to the police action are
> themselves violent or dangerous, the duration of the action, whether the action
> takes place in the context of effecting an arrest, the possibility that the suspect
> may be armed, and the number of persons with whom the police officers must
> contend at one time."  The reasonableness of the use of force is normally an issue
> for the jury. While some courts "freeze the time frame" and consider only the
> facts and circumstances at the precise moment that excessive force is applied,
> other courts, including this one, have considered all of the relevant facts and

NOT FOR PUBLICATION

circumstances leading up to the time that the officers allegedly used excessive force.

Id. (internal citations omitted).

### 1.      Lacik, Abrams, Diakunczak and Mieckowski

Defendants Lacik, Abrams, Diakunczak and Mieckowski ask this Court to find that they did not use excessive force as a matter of law.  Plaintiff, on the other hand, submits that there are genuine issues of material fact regarding the events that led up to plaintiff's arrest and that these facts are relevant to a determination of whether the police officers' actions were objectively reasonable.  The Court agrees and recognizes that there are also disputes as to whether Lacik rammed plaintiff's vehicle and the amount of force used to remove plaintiff from his vehicle by Diakunczak and Abrams.  While Mieckowski argues that the claim against him should be dismissed because it is undisputed that he was not involved in removing plaintiff from his vehicle, plaintiff has evidence that a number of officers' feet were thrust into his back after he was removed from the minivan.  Because it is undisputed that Mieckowski and Abrams did come around to where plaintiff was on the ground, a reasonable jury could believe that it was Mieckowski feet that were thrust into plaintiff's back.  These disputes preclude the entry of summary judgment in favor of defendants on this claim.  These disputes also defeat defendants' arguments that they are entitled to summary judgment because of qualified immunity.

### 2.      Engram and Palko - Supervisory Liability

With respect to Engram, there is a genuine issue of material fact as to whether he had knowledge of and acquiesced in Abrams's actions which may constitute excessive use of force. There is no dispute that Engram witnessed plaintiff being removed from his vehicle and that

-18-

NOT FOR PUBLICATION

Abrams grabbed plaintiff's arm in the process.  Engram's claim of qualified immunity is also

unavailing as there are genuine issues of material fact that must be resolved in order to determine

whether his actions were objectively reasonable.  Engram's motion for summary judgment on the

excessive use of force claim is denied.

As to Palko, plaintiff presents no evidence that Palko had knowledge of and acquiesced in

the excessive use of force against plaintiff.  Palko was not present during the pursuit or removal

of plaintiff from his vehicle.  In fact, Palko did not become aware of the incident until after

Hemenway was arrested.  For this reason, Palko's motion for summary judgment on this claim is

granted.

D.   Malicious Prosecution

"A civil action for § 1983 malicious prosecution requires that: (1) the defendant initiate a

criminal proceeding; (2) which ends in plaintiff's favor; (3) which was initiated without probable

cause; and (4) the defendant acts maliciously or for a purpose other than bringing the defendant

[sic] to justice."  Rose v. Bartle, 871 F.2d 331, 349 (3d Cir. 1989).

1.   Lacik, Abrams, Diakunczak and Mieckowski

Lacik and Abrams argue that they are entitled to summary judgment on the malicious

prosecution claim because there was probable cause.  As discussed earlier, however, there is a

genuine issue of material fact as to whether there was probable cause to initiate criminal

proceedings against plaintiff for eluding.  Defendants' reliance on qualified immunity must also

fail as there are genuine issues of material fact as to whether defendants' actions were objectively

-19-

**NOT FOR PUBLICATION**

reasonable.  Lacik and Abrams's motion for summary judgment on the malicious prosecution

claim is denied on these grounds.

Diakunczak and Mieckowski raise a different argument.  They argue that in addition to

the four traditional common law elements of malicious prosecution, plaintiff must also prove

"some deprivation of liberty that rises to the level of Fourth Amendment 'seizure . . . .' "  Mantz

v. Chain, 239 F. Supp. 2d 486, 501 (D.N.J. 2002).  Plaintiff does not contest this in his

opposition brief.  While plaintiff was arrested, a "seizure" within the meaning of the Fourth

Amendment, not all Fourth Amendment seizures can serve as the basis for a malicious

prosecution claim.  Id.   Because "the tort of malicious prosecution concerns the 'perversion of

proper legal procedures,' [plaintiff] must show that he suffered a seizure as a consequence of a

legal proceeding."  Id. (quoting Gallo v. City of Philadelphia, 161 F.3d 217, 222 (3d Cir.1998)).

"Generally, the offending legal process comes either in the form of an arrest warrant (in which

case the arrest would constitute the seizure) or a subsequent charging document (in which case

the sum of post-arraignment deprivations would comprise the seizure)."  Nieves v. McSweeney,

241 F.3d 46, 54 (1st Cir. 2001).  The Mantz court held that because Mantz's arrest was not made

pursuant to a warrant and occurred before the filing of the criminal complaint, it could not serve

as the basis for his malicious prosecution claim.  Id. at 502.  See also Nieves, 241 F.3d at 54;

Singer v. Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995);  Kingsland v. City of Miami,

382 F.3d 1220, 1235 (11th Cir. 2004).

The facts here indicate that plaintiff cannot maintain a malicious prosecution claim

against Diakunczak, Mieckowski, Lacik or Abrams because plaintiff cannot show some

NOT FOR PUBLICATION

deprivation of liberty that rises to the level of Fourth Amendment "seizure" as that term is used in the context of a malicious prosecution claim.  It is undisputed that plaintiff was arrested without a warrant before the criminal complaint was filed and the summons was issued.  Thus, his arrest cannot be the basis of his malicious prosecution claim.  And plaintiff does not argue nor offer evidence of any subsequent charging documents or post-arraignment deprivations that would constitute a "seizure."  Under these circumstances, Diakunczak, Mieckowski, Lacik and Abrams are entitled to summary judgment on plaintiff's malicious prosecution claim.

<em>2.      Engram and Palko - Supervisory Liability</em>

As none of their subordinates violated plaintiff's civil rights in the form of a malicious prosecution, Engram and Palko cannot be liable.  Only if they had directed others to violate plaintiff's constitutional rights or had knowledge of and acquiesced in their subordinates' violations would they be liable.  Because the above analysis demonstrates that their subordinates did not maliciously prosecute plaintiff, Engram and Palko could not have directed them to either violate plaintiff's rights or know and acquiesce to such a violation.  Engram and Palko are entitled to summary judgment on the malicious prosecution claim.

**II.      State Law Claims**

In addition to his section 1983 claims, plaintiff also asserts five state law claims against defendants.  To recap, those claims are for intentional and negligent infliction of emotional distress, assault and battery, malicious prosecution, and false arrest and imprisonment.

A.      Intentional and Negligent Infliction of Emotional Distress

NOT FOR PUBLICATION

Under New Jersey law, to maintain a claim for intentional infliction of emotional distress, a plaintiff must show that: "the defendant acted intentionally or recklessly, both in doing the act and producing emotional distress; the conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; the defendant's actions were the proximate cause of the emotional distress; and the distress suffered was so severe that no reasonable person could be expected to endure it." Turner v. Wong, 363 N.J.Super. 186, 199-200 (N.J.Super.A.D. 2003) (citing Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988)).

The elements of negligent infliction of emotional distress are: "(a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury." Dello Russo v. Nagel, 358 N.J.Super. 254, 269-70 (N.J.Super.A.D. 2003). "Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed." Id. Regardless of whether a plaintiff is suing for intentional or negligent infliction of emotional distress, a plaintiff "is required to show, among other things, that she has suffered emotional distress 'so severe that no reasonable man could be expected to endure it.'" Schillaci v. First Fidelity Bank, 311 N.J.Super. 396, 406 (N.J.Super.A.D. 1998) (quoting Buckley, 111 N.J. at 366-67). Severe emotional distress is a "severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Id. (quoting Taylor v. Metzger, 152 N.J. 490, 515 (1998)). Emotional distress must be "sufficiently substantial to result in physical illness or serious psychological sequelae" to be compensable. Id.

-22-

NOT FOR PUBLICATION

      The Court first considers whether plaintiff has evidence to satisfy each of the elements of

these claims sufficient to support a jury verdict in his favor.  If the jury were to believe plaintiff's

version of the events that took place, meaning that defendants knew or should have known

plaintiff was not the target of their investigation and he was not armed, and that he did not know

he was being chased by police officers, defendants' actions in the course of pursuing and

arresting plaintiff could qualify as outrageous conduct that was reckless or negligent.

Furthermore, plaintiff has evidence that he is suffering from post-traumatic stress disorder as a

result of the events that occurred on October 30, 2002.  The Superior Court of New Jersey,

Appellate Division has said that severe emotional distress includes post-traumatic stress disorder.

Schillaci, 311 N.J.Super. at 406.  Thus, any argument that plaintiff cannot prove the elements of

his claims is unavailing.

      Defendants also argue that plaintiff's emotional distress claims are barred by the New

Jersey Tort Claims Act ("NJTCA") which provides:

> No damages shall be awarded against a public entity or public employee for pain
> and suffering resulting from any injury; provided, however, that this limitation on
> the recovery of damages for pain and suffering shall not apply in cases of
> permanent loss of a bodily function, permanent disfigurement or dismemberment
> where the medical treatment expenses are in excess of $3,600.00.

N.J.S.A. § 59:9-2(d).  The New Jersey Supreme Court has held that "claims for emotional

distress are encompassed by the term 'injury' in N.J.S.A. 59:9-2(d)."  Ayers v. Jackson Tp., 106

N.J. 557, 575 (1987).  The Ayers court also said that the subjective symptoms "such as

depression, fear, and anxiety" incurred as a consequence of emotional distress constitute pain and

suffering for the purposes of the NJTCA.  Id. at 577.  On the other hand, "emotional distress or

NOT FOR PUBLICATION

psychological harm can qualify as a 'permanent loss of a bodily function' when caused by a physical assault such as a violent sodomy or rape." <u>Willis v. Ashby</u>, 353 N.J.Super. 104, 110 (N.J.Super.A.D. 2002) (citing <u>Collins v. Union County Jail</u>, 150 N.J. 407 (1997)). In <u>Collins</u>, the New Jersey Supreme Court held that an inmate who was raped by a corrections officer was not barred by N.J.S.A. § 59:9-2(d) from recovering for emotional injuries sustained as a result thereof:

> Because we are persuaded that the Legislature contemplated that "emotional trauma can be as disabling as a visible physical wound," psychological and emotional injuries should be treated the same as physical injuries under the Act's threshold provision when they arise in a context similar to that which precipitated plaintiff's injuries. We hold that N.J.S.A. 59:9-2(d) does not immunize Union County from liability for the post-traumatic stress disorder from which plaintiff allegedly suffers, and will allegedly suffer permanently, as a result of the rape by the corrections officer. We find that that the alleged debilitating psychological disorder constitutes a "permanent loss of a bodily function" pursuant to N.J.S.A. 59:9-2(d). We leave to the trial court on remand to determine whether the severity of plaintiff's injuries can be characterized as "substantial," the threshold standard articulated today in <u>Brooks v. Odom</u>.

<u>Id.</u> at 423 (internal citations omitted). In <u>Willis</u>, the court held that "if plaintiffs present a case for the jury on medical causation of the stillbirth of the child as a result of defendants' negligence, plaintiffs, in our view, have suffered a permanent loss of a bodily function, disfigurement or dismemberment, or in the language of the 1972 Task Force Comment, an 'aggravated circumstance,' not a 'subjective or minor incident.'" <u>Id.</u> at 112.

Plaintiff asks the Court to find that his case is comparable to the facts of <u>Willis</u> and <u>Collins</u>. To do so would be a great stretch of the law as it now stands. The facts giving rise to plaintiff's claim are surely not comparable to the sexual assault suffered by the plaintiff in <u>Collins</u>, nor can they be likened to parents affected by a negligently-caused full-term stillborn

NOT FOR PUBLICATION

baby.  The New Jersey Supreme Court said that psychological and emotional injuries should be treated the same as physical injuries under the NJTCA's threshold provision when they arise in a context similar to a sexual assault.  Such similarity does not exist here.  For this reason, defendants' motions for summary judgment on plaintiff's intentional and negligent infliction of emotional distress claims are granted.  In light of this conclusion, the Court need not consider whether defendants are entitled to good faith immunity under N.J.S.A. § 59:3-3.

 B.  <u>Assault and Battery</u>

 Battery is established by "'proof of an unauthorized invasion of the plaintiff's person, even if harmless . . . .  Any non-consensual touching is a battery.'" <u>Russo Farms, Inc. v. Vineland Bd. Of Educ.</u>, 144 N.J. 84, 105 (1996) (quoting <u>Perna v. Pirozzi</u>, 92 N.J. 446, 460-61 (1983)).  A person may be liable for battery under New Jersey law if that person "'acts intending to cause a harmful or offensive contact . . . or an imminent apprehension of such contact' and a 'harmful' or 'offensive' contact 'directly or indirectly results.'"  Restatement (Second) of Torts §§ 13, 18.  One who acts with the intent to cause a harmful or offensive contact or an imminent apprehension of such contact "may be liable for assault even if no contact actually results if the victim is placed in 'imminent apprehension' of a harmful or offensive contact."  <u>Abraham v. Raso</u>, 15 F. Supp. 2d 433, 448 (D.N.J. 1998) (citing <u>Giovine v. Giovine</u>, 284 N.J.Super. 3, 33 (N.J.Super.A.D. 1995)).

 <u>*1.*</u>  <u>*Engram and Palko*</u>

 Plaintiff submits no evidence from which a jury could find that Engram or Palko assaulted him or had any physical contact with plaintiff.  Plaintiff admits that Engram never

NOT FOR PUBLICATION

touched or spoke to plaintiff on the evening of October 30, 2002.  While Palko testified that he

spoke to plaintiff on the evening of October 30, 2002, (Palko's Dep. at 32:1-7), it is undisputed

that Palko did not take part in the pursuit of plaintiff.  Plaintiff presents no evidence that Palko

ever touched or assaulted him.  Plaintiff also does not argue nor offer any legal support for

holding Engram and Palko liable for assault and battery under a supervisory liability theory.  For

these reasons, Engram and Palko are granted summary judgment on the assault and battery claim.

2.      *Lacik, Abrams, Diakunczak and Mieckowski*

As to Lacik, Abrams, Diakunczak and Mieckowski, there is evidence that they had non-

consensual physical contact with plaintiff.  There is no dispute that Abrams and Diakunczak had

contact with plaintiff when removing him from his vehicle.  As mentioned earlier, there is a

genuine dispute as to whether Mieckowski was one of the officers who thrust his feet onto

plaintiff's back when he was on the ground.  There is no dispute that Lacik came into contact

with plaintiff's car as plaintiff was driving and there is evidence that Lacik lunged at plaintiff

with his fists raised after plaintiff was removed from his vehicle.  In light of this evidence, there

are genuine issues of material fact that prevent the Court from entering summary judgment in

defendants' favor.

As to whether they are entitled to good faith immunity under N.J.S.A. § 59:3-3, the New

Jersey Supreme Court has held that "[t]he same standard of objective reasonableness that applies

in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act."

Wildoner v. Borough of Ramsey, 162 N.J. 375, 387 (2000).  As there are genuine issues of

-26-

NOT FOR PUBLICATION

material fact regarding whether their actions were objectively reasonable, Lacik, Abrams,

Diakunczak and Mieckowski's motions for summary judgment on this claim are denied.

### *3.*        *MCPO and Edison Township*

As the NJTCA only allows for direct liability of public entities under circumstances not

present here, the MCPO and Edison Township can only be liable to plaintiff on his state law

claims under the theory of respondeat superior.  The NJTCA provides:

> a. A public entity is liable for injury proximately caused by an act or omission of a
> public employee within the scope of his employment in the same manner and to
> the same extent as a private individual under like circumstances.
>
> b. A public entity is not liable for an injury resulting from an act or omission of a
> public employee where the public employee is not liable.

N.J.S.A. § 59:2-2.  Thus, if the individual officers are not liable, neither are the public entities.

Hart v. City of Jersey City, 308 N.J.Super. 487, 493 (N.J.Super.A.D. 1998).  As the Court has

found that a jury could find Lacik, Diakunczak and Mieckowski liable for assault and battery,

Edison Township may be held vicariously liable.  Because summary judgment is entered in

Engram's favor on this claim, the MCPO cannot be held vicariously liable.

With regard to Abrams, this Court has already determined in a separate opinion that

Edison Township is not vicariously liable for his actions.  The Court did not determine whether

the State of New Jersey could be held liable for Abrams's conduct, but instead dismissed the

Third-Party Complaint against the State on Eleventh Amendment grounds.  Even so, Wright v.

State of New Jersey, 169 N.J. 422 (2001), makes clear that the State can be held vicariously

liable under the NJTCA for actions of state employees. The MCPO did not raise any legal

arguments with regard to the issue of which entity is vicariously liable for Abrams's conduct

NOT FOR PUBLICATION

except to simply state that it is only responsible for Engram's actions.  As plaintiff did not name the State of New Jersey as a defendant in his suit, that leaves the MCPO as the only other potential party to this action who could be held vicariously liable for Abrams's actions.  The statute provides for liability when the public employee is acting "within the scope of his employment . . . ."  N.J.S.A. § 59:2-2.  The undisputed facts indicate that Abrams was on loan to the MCPO's task force during the events of October 30, 2002 and that the MCPO reimbursed Edison Township for a portion of Abrams's salary.  Without making any determination whether the State of New Jersey or Middlesex County is vicariously liable for Abrams's conduct, the Court concludes that the MCPO is responsible for Abrams's actions on the night in question. That said, the MCPO could be held vicariously liable if Abrams is found liable for assault and battery.   For these reasons, the MCPO's motion for summary judgment on this claim is granted in part and denied in part. Edison Township's motion is denied.

  C.  Malicious Prosecution

  A common law malicious prosecution claim has four elements: "(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff."  Epperson v. Wal-Mart Stores, Inc., 373 N.J.Super. 522, 530 (N.J.Super.A.D. 2004).

  It appears from the undisputed facts that only Palko, Lacik and Abrams were involved in the decision and/or process of charging plaintiff with eluding.  That Abrams and Palko did not sign the complaint is not determinative of whether the first factor is satisfied.  See Epperson, 373

NOT FOR PUBLICATION

N.J.Super. at 531 (The first factor "may be met by proof that defendant took 'some active part in instigating or encouraging the prosecution' or 'advis[ing] or assist[ing] another person to begin the proceeding, [or by] ratif[ying] it when it is begun in defendant's behalf, or [by] tak[ing] any active part in directing or aiding the conduct of the case.'").  As there is no evidence that Engram, Diakunczak and Mieckowski took part in the decision to charge plaintiff with eluding, they are entitled to summary judgment on this claim.  The only other argument offered by Lacik and Abrams is that they had probable cause as a matter of law to charge plaintiff with eluding. As mentioned earlier, whether they had probable cause depends on a number of material facts to which there are genuine disputes.  Thus, this argument is of no avail.  Palko, Lacik and Abrams also contend that they are entitled to good faith immunity from liability for this claim.  However, because whether their actions were objectively reasonable is subject to genuine issues of material fact, their motions for summary judgment must be denied.

Because Engram is not liable to plaintiff for malicious prosecution, but Abrams may be, the MCPO may be vicariously liable for Abrams's conduct.  Because a jury could find Palko and Lacik liable, Edison Township's motion for summary judgment on this claim is denied.

D.    False Arrest and False Imprisonment

Plaintiff's state law false arrest and imprisonment claim mirrors his section 1983 claim. As to Engram and Palko, it is undisputed that neither defendant participated in plaintiff's arrest and plaintiff offers no argument that they can be liable based on their position as supervisors under state law.  Thus, they are entitled to summary judgment on this claim.  With regard to Lacik, Abrams, Diakunczak and Mieckowski, because a reasonable jury could find that

NOT FOR PUBLICATION

defendants did not have probable cause to arrest plaintiff for eluding, their motions for summary

judgment on this claim are denied.  Good faith immunity is not available to defendants on this

claim as the statute specifically provides that they are not immunized from false arrest and false

imprisonment claims.  N.J.S.A. § 59:3-3.  Furthermore, in light of the Court's decision with

respect to the individual defendants, Edison Township and the MCPO are not entitled to

summary judgment on the vicarious liability claims against them.

**III.   Punitive Damages**

The last issue to be addressed is plaintiff's claim for punitive damages.  Edison Township

argues that this claim must be dismissed because such a claim cannot proceed under state or

federal law.  N.J.S.A. § 59:9-2(c) provides that "[n]o punitive or exemplary damages shall be

awarded against a public entity."  As to federal law, the United States Supreme Court has said

that "punitive damages are not available under § 1983 from a municipality."  Kentucky v.

Graham, 473 U.S. 159, 167 n.13 (1985).  For these reasons, plaintiff's punitive damages claim

against Edison Township is dismissed.

**CONCLUSION**

In sum, Engram's motion for summary judgment is DENIED on Counts One and Two

and GRANTED on Counts Three through Eight; the MCPO's motion for summary judgment is

GRANTED on Counts One through Five and then GRANTED in part and DENIED in part on

Counts Six through Eight; Lacik's motion for summary judgment is DENIED on Counts One,

Two, Six, Seven and Eight, and GRANTED on Counts Three through Five; Palko's motion for

summary judgment is GRANTED on Counts One through Six and Count Eight and DENIED on

**NOT FOR PUBLICATION**

Count Seven; Edison's motion for summary judgment is GRANTED on Counts One through

Five and DENIED on Counts Six through Eight; Diakunczak's motion for summary judgment is

DENIED on Counts One, Two, Six and Eight and GRANTED on Counts Three through Five and

Count Seven; Mieckowski's motion for summary judgment is DENIED on Counts One, Two,

Six and Eight and GRANTED on Counts Three through Five and Count Seven; and Abrams's

motion for summary judgment is DENIED on Counts One, Two, Six, Seven and Eight, and

GRANTED on Counts Three through Five.


                                               **s/William H. Walls**
                                               United States District Judge

**NOT FOR PUBLICATION**

**Appearances**

Mark Berman
Jennifer A Hradil
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5496

Ellen M. Hale
Attorney General's Office
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112

Steve Mannion
DeCotiis, Fitzpatrick Cole & Winsler, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666

Patrick J. Bradshaw
Kelso & Bradshaw
132 Hamilton Street
P.O. Box 1208
New Brunswick, NJ 08901

Linda G. Harvey
Michael H. Freeman
Greenberg, Dauber, Epstein & Tucker
One Gateway Center, Suite 600
Newark, NJ 07102-5311

Alan J. Baratz
Adam Kenny
Weiner Lesniak, LLP
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438

Lori A. Dvorak
Lynch Martin
1368 How Lane

**NOT FOR PUBLICATION**

P.O. Box 6022
North Brunswick, NJ 08902